## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**EMERSON AGUIRRE-MORALES,**<br><br>*Defendant.* | **Crim. No. 22-cr-218 (TJK)** |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Emerson Morales, now 21, was a day shy of 18 when he encountered someone affiliated with MS-13—a brutal gang that had terrorized him and his family both here and in his home country. Emerson had an interaction with him that he perceived as threatening and flashed a gun before walking away. Unfortunately, in the presence of a far older friend who was driving him, Emerson circled back and fired shots at the individual as he rode his bike, hitting him in the knee. He did so knowing that it would earn him respect by a rival gang he admired, 18th Street.

This action was dead wrong, as is the cycle of violence between gangs that too often causes collateral damage to innocent bystanders. But Emerson is so much more than just a 17-year-old kid that pulled the trigger that day. He is a survivor of an unfathomable number of devastating traumatic events. He is a brother and son who worked long hours demolishing buildings and washing dishes to bring money home to his family. He is a striver who has worked hard in jail to further his education and develop life skills. And he is a young man who has matured through the crucial three years of 18-21 in D.C. jail, accepted responsibility, and turned his back on the lifestyle and associations of his adolescent push for safety and protection.

Congress has instructed federal judges to balance society's interests in deterrence and punishment with the unique history and characteristics of the individual that stands before them.

1

These requirements reflect the "uniform and constant federal judicial tradition of considering every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quotation omitted). After considering the U.S. Sentencing Guidelines (USSG) and all of the statutory factors under 18 U.S.C. § 3553(a), the defense concurs with probation that "[c]onsidering the trauma and violence Mr. Morales has experienced and witnessed at a young age, the Court may consider whether a sentence within the advisory guideline range, despite the nature and circumstances of the instant offense, is greater than necessary to reflect the factors set forth in 18 USC § 3553(a)." PSR, ¶ 142.

Indeed, numerous other factors support a downward departure. These include Emerson's youth at the time of the offense, the nature of the altercation, the history of the case, Emerson's dedication to self-improvement in D.C. jail, the average USSG outcome and analogous DC Guidelines, and the counterproductive nature of incarcerating juveniles and young adults, as established in scientific studies. In light of these factors, the defense respectfully requests a sentence of 90 months, with a 6-month deduction under *United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994) (holding that a downward departure is appropriate for deportable aliens whose status makes them ineligible for six month prerelease). This sentence is sufficient, but not greater than necessary to meet the purpose of sentencing for this unique young man.

## LEGAL STANDARDS

The fundamental requirement of a federal sentence is to be "sufficient, but not greater than necessary, to comply with the purposes" set forth in 18 U.S.C. § 3553(a). Courts must consider ten factors when sentencing a defendant: (1) "the nature and circumstances of the offense"; (2) "the history and characteristics of the defendant"; (3) the need for the sentence imposed to

reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (4) the need to afford adequate deterrence to criminal conduct; (5) the need to protect the public from further crimes of the defendant; (6) the need to provide the defendant with needed correctional treatment; (7) the kinds of sentences available; (8) the Sentencing Guidelines and policies; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to any victims of the offense.

## ANALYSIS

### I.   Emerson's History and Characteristics

Emerson is a sweet, kind, loyal, determined, and hard-working young man with a natural intelligence that belies his lack of formal education. Paulina Reyes, who was his girlfriend of four years, describes him as "the most caring and gentle person I have come across" and "the most…intelligent and most warm hearted person you could meet." Ex. 1 at 2. Emerson's path from a young boy in El Salvador to the 21-year-old man he is today is full of heartbreaking trauma, which has naturally caused him to bury his emotions and develop a tough exterior to survive. The last three years have given him protection and a chance to focus on himself, however, and he has used that time to better himself, earning certificates in Environmental and Sanitation Procedures, Personal Finance, Leadership in Sports, Financial Literacy, and "Thinking for a Change," a program of cognitive self-change and problem-solving skills. Ex. 2. Ms. Reyes writes that "he's a whole different person from how he was before. Jail has really taught him how to value what's most important, which is how to love and care for the people that most care about him." Ex. 1 at 2. Amazingly, she writes, "If you ask me if I would go through this process again, I would say yes because he's worth the wait. He's worth everything." *Id.*

It is difficult to express the depth of violence and trauma that Emerson witnessed in his young life. His life story is admirably captured by the letter of Christine Penry, a mitigation specialist with expertise in El Salvador. Ex. 3. As she recounts, Emerson was born on May 22, 2003, in San Miguel, El Salvador to Marta Alicia and Jose Maria. His parents were never married but were together at the time of his birth and later separated when he was 6 years old.

When Emerson was born, he lived with his father and mother in Playa Grande, a rural village outside of San Miguel. His sister, Julia, was born 3 years later. They lived in a two-bedroom adobe house with a brick floor and cement walls. They did not have indoor plumbing and instead used an outhouse. Emerson's father worked on a milk farm harvesting bananas and his mother worked in San Miguel doing hair. Emerson does not recall seeing his parents together that often because his mother worked an hour and a half away and would sometimes stay in San Miguel for days at a time. Eventually, Emerson's mother moved out and took his sister, Julia, to a town 20 minutes away leaving Emerson alone with his father.



*Emerson and his sister holding his mother's cosmetology diploma*

With his mother gone and his father working, Emerson spent most of his formative years unsupervised. Emerson went to C.E.C. Playa Grande for 1st and 2nd grade and Los Rillitos for 3rd and 4th grade. In El Salvador, children either go to school in the morning or afternoon as most are needed at home to help with domestic duties or to work to help provide an income. Emerson went to school in the afternoon from noon to 4pm. His father was gone from 4am to 4pm starting at age 6. His aunt, lived behind him and would help feed him or Emerson would make himself eggs and sausage on the stove. No one was present to help him with his schoolwork.

When he was 7 years old, Emerson's family was in a car accident when their brakes failed while driving down a steep road. In the first of many traumas, Emerson went to the scene of the accident and saw his two cousins dead in the vehicle. After 2nd grade, Emerson faced ongoing issues at school with the local gangs. He was harassed daily at the Playa Grande bus stop by MS-13 gang members who threatened to harm him if he didn't join. His mother was extorted for rent money in exchange for letting her live. On the weekends, Emerson stayed with his mother and remained inside her home in San Miguel because he was too afraid to go outside. Emerson's mother did not get involved with his home life while he lived with his father and in general, Emerson had very little guidance or support. By the 4th grade, Emerson dropped out of elementary school because the daily threats made it unsafe for him to even attend school. His father advised Emerson to stay home in order to protect himself, and he convinced Emerson to drop out of school for his own safety.

Instead of going to school, Emerson began going to work with his father by age 9. Emerson helped his father with the cows by milking and feeding them. He would also drive the tractor to harvest bananas. Emerson worked a full day and got paid $20.00 a week.



*Emerson on the farm*

Dropping out of school did not shield Emerson from the violence that the gang members, especially MS-13, inflicted on his community. Indeed, Emerson's childhood in El Salvador was saturated by violence inflicted upon his family and perpetrated by his extended family. Emerson would see people getting hanged and bodies chopped up into pieces in the street, "including children." Ex. 4 at 7 (Tabashneck Report). Emerson recalled the first time he saw a couple who had been hanged in a tree and burned. He was only 9 years old. No one called the police because they were an hour away so everyone in the community saw the mutilated bodies by the time anyone was able to come collect them.

Emerson also personally knew people who went missing or friends whom he never saw again. At age 11, Emerson's long-time friend, who was 15, was kidnapped and tortured. According to Emerson, "They cut all over his body and they just left him in the street." *Id*. Around the same time, his father's longtime friend was murdered. The friend worked on the bus and men took the friend off the bus and killed him. Emerson said that he thinks about these murders, especially the murder of his childhood friend, and "how they are not here." *Id*.

6

In sum, by age 11, Emerson had seen two cousins die, a friend tortured, had two friends who were murdered, learned of his father's friend being murdered. Additionally, Emerson's uncle spent 22 years in prison in El Salvador for conspiracy and murder involving the Batos Locos gang, and his cousin, who was 14 years old, received a 13-year sentence in El Salvador for crimes related to MS-13 gang activity.



*Emerson holding his cousin*

Around age 12, the MS-13 gang began showing an interest in Emerson's sister. The gang was searching for her in schools and houses and wanted to kidnap her. Emerson felt scared "because you didn't know when they were going to get you out of your house." *Id.* Fearing for her daughter's life, Emerson's mother made the decision to bring him and his sister to the United States to escape MS-13 when he was 12 years old. This 15-day trek from El Salvador to Texas was its own trauma. The trip, organized by a "coyote," was stressful and dangerous. Emerson worried for his mother and sister, who were vulnerable due to their size and gender, and the family was hungry and had little to eat. At one point, while crossing a river, a stranger took out a firearm and pointed it at his group. *Id.*

Once they arrived in Texas, Emerson's grandmother sent them bus tickets. She had moved to D.C. five years prior to Emerson's arrival. Three months after they settled into D.C., Emerson's father had to flee El Salvador. Emerson's father's life was in danger after he witnessed the murder of his friend. His father watched 3 guys on motorcycles attack and murder his friend, and he followed them to see where they buried his body. The next day, the gang members came looking for his father. He fled to the United States and went straight to New York City where he has remained since. Despite moving to the U.S., and caring for Emerson in his youth, Emerson's father has never sought a relationship with him, which hurts him to this day.

Once Emerson and his family reached Columbia Heights, he lived with his grandmother, his mother, his sister, and two uncles in a tiny apartment on Belmont Street, NW. Upon arrival to D.C., Emerson enrolled in Lincoln Middle School in the 6th grade.



*Emerson with his mother and sister after arriving in the U.S.*

It was a hard transition: in addition to having to settle into a new location with new foods and culture, Emerson didn't speak any English. Emerson said it was hard to navigate through the city because he had never grown up with public transportation or even buildings and couldn't read signs or directions. He took English as a Second Language (ESL) classes, but it took him 3 years to be able to communicate effectively.

Emerson's neighborhood was also plagued by violence. He frequently heard shootouts, saw people fighting on the street and in his school, and was targeted by MS-13 based on his Salvadorean background. Emerson recounts, "I found out there were the same gangs over here too. They thought I was something that I wasn't and so they started fights." *Id*. He started getting in trouble for fighting, and his school attendance dropped.

Because of Emerson's initial inability to assimilate on his own, he was drawn to other students who spoke Spanish, regardless of whether they might have had a negative influence on him or not. The first friend he made was with a Salvadorean student, who helped show him around school. Unfortunately, this friend was associated with the 18th Street gang. Having worked so hard to avoid being associated with a gang in El Salvador, Emerson was reluctant to get involved with gang members. However, he felt he had no choice but to become friends with the first Spanish-speaking person who tried to help him around his new school. Emerson's was being targeted, and his new friend offered him protection from their neighborhood violence. Without anyone else to connect with, and with no father figure in his life, it was easy for Emerson to attach himself to him.



*Emerson around 8th grade*

With his mother working, the friends Emerson made in school and in his neighborhood became his support system. At age 13, those same friends introduced him to marijuana. He said that people in El Salvador did not smoke marijuana as much as he saw people doing in the United States. Marijuana use escalated into Percocet abuse several years later.

Emerson's time in school did not go well. He was removed from Lincoln Middle School for getting involved in too many fights and he was placed in Roosevelt High School for 8th and 9th grade. School records indicate that Emerson missed numerous school days and letters were sent home regarding his truancy that went unanswered furthering his cycle of educational neglect. During those school years, he also spent time at Youth Services Center (YSC).



*Emerson around 9th grade*

As Emerson grew closer to his Salvadorean friends, he began to witness and suffer from the effects of gang violence. One of his friends was murdered and five others were seriously wounded by gun violence. Then, at age 16, he was shot himself in the arm by a stranger during a drive-by shooting. Emerson never went to the hospital because he was too scared, and his mother helped treat him at home. However, because he never received treatment, he currently has ongoing numbness down his forearm. In order to protect himself, Emerson officially joined the 18th Street gang after getting shot.

Sadly, Emerson experienced yet more trauma. When he was 17, he witnessed another friend get murdered. Two of his friends were leaving in a vehicle when Emerson came out. As the vehicle was moving backwards, he tapped the car so he could retrieve an item from the vehicle. When he looked up, Emerson saw a man with a gun in his hand shooting. Both men were struck, and his friend died in his arms at the scene before an ambulance could arrive. Emerson recounted how his friend "knew he was gone" and "just said I love you and closed his eyes, and that was all. I couldn't do

11

anything." *Id.* at 9. This incident has caused Emerson tremendous guilt since his tapping of the car made his friends slow down, and they might have driven off before being shot if he had not done so. Even years later, he thinks about the shooting at least twice a week.

Around this time, Emerson joined his friends in an armed robbery and began a period of supervision within the juvenile system. While he impressed his initial supervisor, the emphasis on school attendance and success was difficult for Emerson, who was several grade levels behind and still weak in his English. His grades were dismal, as was his attendance. With his unprocessed trauma and deep desire for belonging with his 18th Street Salvadorean friends, Emerson was not in a good place for a school-based program. He dropped out of school for the second time in the 9th grade.

While he never found his footing at school, Emerson was an extremely hard worker who was dedicated to supporting his family. At 16, he got a job helping his aunt clean buildings at Georgetown University. He did this for two summers and made $15 an hour. He used the money he made to help his mother pay their bills. In 2019, he got a job doing demolition work for a man named, Mike. They travelled to Texas, Pennsylvania, New Jersey and Virginia. He cut walls and assisted in tearing down apartment housing. Emerson enjoyed this job because it kept him away from his neighborhood and helped him stay out of trouble. Eventually, the construction work slowed down and he got a job at Little Minor Taco on Rhode Island Avenue. Emerson worked at two of their locations cleaning dishes and expediting food. He worked 10am to 4pm at their Rhode Island, NE location and 5pm to 10pm at their Rhode Island, SE location. He made $800 a week and he gave his mother $400 to help with the rent and $100 to help with their phone bill. Emerson was able to maintain this job during COVID because the restaurant turned itself into a food stand allowing people to get food to go.

Feeling the pressure to provide for his family and his unresolved acute post-traumatic stress from being shot, Emerson's marijuana use turned into Percocet abuse, and he was taking 30mg 10 times a day. Emerson only weighed 120 pounds at the time and he said he would eat and throw up constantly from the drug abuse. There were times when the Percocet that he took was laced with fentanyl. Emerson said that because of the anxiety that his neighborhood surroundings induced, the Percocet use helped calm him down. He said he felt more relaxed to be able to cope with an environment that was violently unpredictable. After the death of his friend, Emerson abused drugs even more to numb his pain and the trauma of being exposed to continuous violence. He describes taking more risks with his own life and stopping caring about the physical and mental consequences that his decisions might create. This led to the moment of "hot cognition" in this case, when he flashed a gun at a member of MS-13 after feeling threatened and then circled back and shot him.

After his arrest, Emerson turned his course around. At age 21, he has greatly matured from the not quite 18-year-old who pulled the trigger. He has now been clean and sober for more than three years. He has worked hard to complete his GED, although a shortage of teachers has delayed his finishing. He has completed a bevy of courses and certificates in various life skills. Ex. 2. And he has accepted responsibility for his conduct, including waiving his right to a transfer hearing and proceeding as an adult. As Ms. Reyes wrote, he is truly "a whole different person now."

The history and characteristics described above weigh heavily in favor of a downward departure from the low end of the USSG guidelines range (121 months). To begin with, Emerson's young age alone is a strongly mitigating factor. *Gall*, 552 U.S. at 58. As the Supreme Court has observed:

13

> Immaturity at the time of the offense conduct is not an inconsequential consideration. Recent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five .... [T]he recent [National Institute of Health] report confirms that there is no bold line demarcating at what age a person reaches full maturity. While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant.

*Id*.; *see also* Ex. 4 at 28–38 (explaining brain development and difficulty for adolescent brain to appreciate consequences during "'hot cognition' contexts…characterized by high arousal and intense emotion").

As Dr. Tabashneck observed, "Emerson's youthfulness and probable brain immaturity likely reduced his ability to engage in decision making that reflected good judgment and maturity and further reduced his ability to engage in effective impulse control and adequately appraise the long-term consequences of his actions." *Id*. at 33. Emerson's life before and after his arrest demonstrates the wisdom of the Supreme Court's observation that "[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Roper v. Simmons*, 543 U.S. 551, 567 (2005). Emerson has done a lot of maturing in the last three years, and the requested 30-month departure is justified by his juvenile status at the time of the offense alone. *See, e.g.*, *United States v. Montanez*, 2007 WL 2318527 (E.D. Wis Aug. 9, 2007) (imposing sentence of fifteen months where Guidelines were forty-six to fifty-seven month where defendant's prior convictions primarily occurred when defendant was very young and court notice, difference in his maturity at time of sentencing); *United States v. Naylor*, 359 F. Supp. 2d 521 (W.D. Ve. 2005) (imposing non-career offender sentence of 120 months, rather than 188, because of defendant's youth at the time of priors).

The fact that this is the first period of serious incarceration for Emerson—with the evident maturing effect that one would hope—likewise justifies the requested departure. District courts have varied downward significantly in sentencing where a defendant, regardless of criminal history points, has not previously served a significant custodial term. *See, e.g., United States v. Collington*, 461 F.3d 805 (6th Cir. 2006) (upholding sixty-month downward variance in part because defendant had only been incarcerated for seven months prior to his crime); *United States v. Newhouse*, 919 F. Supp. 2d 955 (N.D. Iowa 2013) (varying downward where defendant's only two prior convictions resulted in probationary sentences).

Most importantly, of course, and as recognized by probation (PSR ¶ 142), Emerson's deeply traumatic childhood in El Salvador, followed by his traumatic journey to the United States, followed by even more trauma as Salvadorean gangs fought in his neighborhood and killed his friends—leaving him shot in the arm as a teenager—strongly mitigates against the need for a severe punishment. While not excusing his crime, Emerson's life course and untreated trauma set him up almost predictably to fall into a gang promising brotherhood, cultural support, and protection from MS-13—the very gang that plagued his childhood with vicious violence and threats. *See* Ex. 3 at 3 ("Without the support to process and recover from violent events similar to war, trauma is passed down to future generations. It is not surprising that generations of Salvadoran children have fallen victim to gang recruitment.") And the instant offense grew out of that trauma: having experienced inconceivable series of violent acts against himself and his family by MS-13—including fleeing El Salvador to prevent the kidnapping of his sister—Emerson reacted violently to seeing and feeling threatened by someone associated with MS-13.

## II.   Nature and Circumstances of the Offense

"The distinction between 'nature' and 'circumstances' clarifies that the former refers to the generic offense while the latter encompasses the manner in which the defendant committed it." *United States v. Singleton*, 182 F.3d 7, 11–12 (D.C. Cir. 1999). By its nature, the offense, Violent Crime in Aid of Racketeering, 18 U.S.C. 1959(a)(5) (Attempted Murder), is gravely serious. Reflecting the seriousness of the offense, the guidelines range is 121 to 151 months, and the maximum sentence is 120 months. Notably, however, the average sentence for the offense is 115 months, PSR ¶ 143, and Emerson is far from average in his history and characteristics. In addition, Emerson was concurrently charged with the similar and similarly serious offense under the D.C. Code, Assault With Intent to Kill While Armed (22 D.C. Code §§ 401, 4502). If his plea agreement had been allowed to proceed under that charge, the low end of his guidelines range would have been 90 months, the same sentence requested here. Ex. 5 at 5 (D.C. Voluntary Sentencing Guidelines Quick Reference, Guidelines Master Grid). This supports the conclusion that a 90-month sentence is not an overly-lenient response to this serious offense, even in a city like D.C. with an urgent need to respond to crime.

Moreover, without downplaying the serious *nature* of the offense, there are aspects of its *circumstances* that are mitigating. Emerson did not seek out violence. Rather, the crime happened as a result of a random encounter. At the time, Emerson was focused on his job and his coming 18th birthday. As he describes it, he had been "celebrat[ing] his birthday for three days straight." Ex. 4 at 33. He felt good and "wasn't looking for no problems." *Id*. On the day before his birthday, Emerson encountered the victim, who was associated with MS-13. The two ran into each other in the cramped foyer of a corner store as Emerson was leaving the shop. Emerson felt threatened, putting him in a state of "hot cognition." *Id*. at 34 (explaining the difference between "hot cognition (high emotionality, short time frame)" and "cold cognition (low emotionality, extended time to make a

decision)"). To his credit, Emerson first walked away. He then got in a car driven by an associate, an older member of 18th Street gang.

This was unfortunate: as Dr. Tabashneck explained, due to characteristic features of the adolescent brain, "juveniles are much more at risk of making risky, ill-advised decisions in the presence of peers. The presence of a peer increased his risk for heightened risk taking and dangerous behavior." *Id.* This is especially true for older peers. The older 18th Street member then drove Emerson back around to where the victim was riding a bicycle. Emerson fired multiple shots at the victim, hitting him in the leg and causing serious bodily injury.

While nothing could excuse or justify this act of public violence, the long history of violence against Emerson, his family, and the community by MS-13 formed the backdrop for Emerson's youthful act of vengeance against a perceived member of MS-13. With his brain trained to respond by the trauma of MS-13, with an older, influential peer in the driver's seat, and with a community of friends in 18th Street gang that had welcomed and protected him, the circumstances of Emerson's actions "reflected judgment impulsivity, in that he failed to give adequate thought to the consequences of his actions in an escalating situation that likely occurred under hot cognition and high arousal." *Id.* These circumstances, which must be considered alongside the nature of the offense under this factor, support the requested sentence of 90 months for this terrible juvenile act—the same sentencing range he would face as an adult with *no* mitigating history for assault with intent to kill while armed under the D.C. Code.

### III. The Need to Provide Deterrence and Rehabilitation

Reflecting the public interest in sentencing, the Court is instructed to consider the "need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and

provide just punishment for the offense; to afford adequate deterrence of criminal conduct; to protect the public from further crimes of the defendant." § 3553(a)(2)(A)–(C). The biggest difference between the government and the defense is in the assessment of the role and ability of lengthy periods of incarceration in meeting these societal goals. The government, without support, argues that a 10-year sentence will serve to deter "similarly situated gang members currently in the community" by "demonstrate[ing] the inordinately high cost of involving oneself in a criminal enterprise that is seemingly single-mindedly devoted to violence and control and the seriousness of injuring others at the behest of the gang…." ECF 46 at 13. Respectfully, the notion that the prospect of an additional 30 months will have any effect on young, troubled men living in violent circumstances with daily survival challenges and all the cognitive challenges discussed by Dr. Tabashneck is simply false.

While many believe that lengthier sentences have a greater deterrent effect, the empirical research shows this to be untrue. "Three National Academy of Science panels … reached that conclusion, as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME AND JUSTICE: A REVIEW OF RESEARCH 28–29 (2006). In one of the best studies of specific deterrence, no difference in deterrence was found even between probation and imprisonment. *See* David Weisburd *et. al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 CRIMINOLOGY 587 (1995). What studies show is that "effective deterrence arises from [the] certainty, not harshness, of punishment." *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011). *See* National Institute of Justice, Five Things about Deterrence, at 1 (May 2016), *available at* https://www.ncjrs.gov/pdffiles1/nij/247350.pdf (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty

of being caught is a vastly more powerful deterrent than the punishment"). Given this reality, adding an extra 30 months would serve no additional deterrent purpose.

Excluding these months, on the other hand, would help fight recidivism. Studies reveal that offenders who are sentenced to long periods of incarceration are more likely to reoffend, not less. "When prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contracts in the community, and become removed from legitimate opportunities, all of which promote recidivism." Valerie Wright, *Deterrence in Criminal Justice*, The Sentencing Project, at 7 (2010).

These results are especially true for those who commit crimes as juveniles. A ten-year study of outcomes from juvenile sentences found that "juvenile incarceration results in…large increases in the likelihood of adult incarceration." Ex. 6, Aizer & Doyle, *Juvenile Incarceration, Human Capital and Future Crime: Evidence From Randomly-Assigned Judges*, Nat'l Bur. of Econ. Res. (2013), at 2. This study and others were profiled just yesterday in a banner article by James Forman, Jr. in the New York Times, which discussed how a policy shift away from incarcerating juveniles in the late 1990s led to a dramatic decline in juvenile arrests and crime. Ex. 7, James Forman, Jr., "What Happened When America Emptied Its Youth Prisons: Lessons from a radical 20-year experiment and a quiet triumph of public policy," NEW YORK TIMES (Jan. 28, 2025). The article compared two graphs of simultaneous statistics: the number of youths incarcerated in the United States, and the number of offenses committed by youths, as reflected in arrest statistics. The graph showed an almost 1:1 connection between lowered incarceration rates and lowered crime rates:



*Fig. 1: Youths incarcerated in the United States*          *Fig. 2: Youth arrests in the United States*

This dramatic decline reflects a decades-long learning process that should have been known all along: putting young people behind bars with other offenders for long periods of time will inevitably result in creating a class of future offenders ill-equipped to handle life without resorting to crime. Just like with adults, "when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contracts in the community, and become removed from legitimate opportunities, all of which promote recidivism." Wright, *Deterrence in Criminal Justice*, The Sentencing Project, at 7.

This science-based approach is the most faithful way to balance Congress's imperative to balance society's legitimate needs with the unique history and characteristics of offenders like Emerson, who has both a history of trauma and a great promise for leaving the system as an adult ready to resume gainful employment and support his family. As these studies and charts demonstrate, it is actually counterproductive to society's interests to presume that long prison sentences provide deterrence and protect society from future crimes—the opposite is true in most cases, and certainly true here. Rather, to the extent possible consistent with the seriousness of the offense and the need to incapacitate immediately violent offenders, the shorter the sentence, the better the outcome for deterrence, recidivism, and rehabilitation.

Finally, the need for a longer sentence here is mitigated even further by Emerson's immigration status. As part of his plea agreement, Emerson has waived all claims to stay in the United States upon the completion of his sentence and agreed to cooperate and assist immigration authorities with his deportation to El Salvador. Thus, keeping in a U.S. prison for an extra 30 months beyond the 90 months he would have faced under the D.C. guidelines will be especially futile, costing the taxpayers six figures to house and feed someone just to deport him. And the fate that awaits Emerson—a life of fear in a country decimated by gang violence and dominated by an MS-13 gang that has every reason to hound him and kill him—is an extreme punishment in itself. Given this reality, a sentence of 90 months—essentially a D.C. Code sentence—is "sufficient, but not greater than necessary" to meet the purposes of sentencing in § 3553(a). Any more than that is simply unnecessary.

## CONCLUSION

For the foregoing reasons, the defense respectfully requests a sentence of 90 months for Emerson, with a six-month reduction to account for his inability for pre-release under *Smith*.

.

January 29, 2025                                  Respectfully submitted,

                                                 /s/ Matthew J. Peed .
                                                 Matthew J. Peed (D.C. Bar No. 503328)
                                                 CLINTON & PEED
                                                 1775 I St. NW, Suite 1150
                                                 Washington, D.C. 20006
                                                 (202) 919-9491 (tel)
                                                 (202) 587-5610 (fax)

                                                 *Counsel for Defendant Emerson Morales*